AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

**LODGED**
CLERK, U.S. DISTRICT COURT
3/31/2026
CENTRAL DISTRICT OF CALIFORNIA
BY: _____KM_____ DEPTUTY

**FILED**
CLERK, U.S. DISTRICT COURT
03/31/2026
CENTRAL DISTRICT OF CALIFORNIA
BY: _____KL_____ DEPUTY

United States of America

v.

YOUNG JOO KO,

Defendant(s)

Case No.   2:26-mj-01874-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of January 1, 2019 to sometime in July 2025 in the county of Los Angeles in the Central

District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1546(a) | Fraud and Misuse of Visas, Permits, and Other Documents |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Daniel Ha*
_____
*Complainant's signature*

Daniel Ha, Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    March 31, 2026

*Alicia G. Rosenberg*
_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Alicia G. Rosenberg, U.S. Magistrate Judge

AUSA:_ Brenda N. Galván x0715

## **AFFIDAVIT**

I, Daniel Ha, being duly sworn, declare and state as follows:

### I.  **INTRODUCTION**

1.   I am a Special Agent with Homeland Security Investigations ("HSI") and have been so employed since September 2020.  I am currently assigned to the HSI Los Angeles Field Office in the Financial Investigations Taskforce group and serve as a Special Agent in the Orange County Office.  Prior to my employment with HSI, I was a Special Agent with the Internal Revenue Service Criminal Investigation ("IRS-CI") for approximately 11 years.  During the course of my employment with HSI and IRS-CI, I have received training including, but not limited to, various types of financial investigations, immigration fraud, tax fraud, and schemes to conceal and launder the proceeds of such crimes, including training at the HSI Special Agent Training Program and IRS-CI Special Agent Investigative Training Program, both at the Federal Law Enforcement Training Center in Glynco, Georgia.  I have training and experience in conducting criminal investigations involving bank and wire fraud, money laundering, document benefit fraud, tax offenses, identity theft, and related financial crimes related to the Bank Secrecy Act.  These investigations include, but are not limited to investigations of document benefit fraud, specifically those using forged documents.  I have also participated in the execution of search and arrest warrants involving violations of these crimes.

## II. **PURPOSE OF AFFIDAVIT**

2.    This affidavit is made in support of a criminal complaint against, and an arrest warrant for, YOUNG JOO KO ("KO"), for a violation of 18 U.S.C. § 1546(a) (Fraud and Misuse of Visas, Permits, and Other Documents).

3.    This affidavit is also made in support of the following: An application for search warrants for: (1) the person of KO as described in more detail below, in Attachment A-1 (the "SUBJECT PERSON"); and (2) a cellular telephone associated with the telephone number 213-479-5600 (the "SUBJECT TELEPHONE NUMBER"), as described in more detail below, in Attachment A-2 (the "SUBJECT DEVICE").

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all amounts or sums are approximate, and all dates and times are on or about those indicated.

## III. **ITEMS TO BE SEIZED**

5.    The items to be seized are the evidence, fruits, and instrumentalities of violations of the following statutes, as described more fully in Attachment B:  18 U.S.C. §§ 371,

(Conspiracy); 1035 (False statements relating to health care matters); and 1546(a) (Fraud and Misuse of Visas, Permits, and Other Documents) (the "SUBJECT OFFENSES"), as described in Attachment B, which is incorporated herein by reference.

## IV. SUMMARY OF PROBABLE CAUSE

6.   HSI and IRS-CI in coordination with the United States Citizenship and Immigration Services ("USCIS") are investigating a medical fraud scheme exploiting the green card application process by creating fraudulent immigration documents. Specifically, USCIS-designated civil surgeons, "H.K." and "H.L.," operating in the Los Angeles area, are not examining green card applicants as required by law.  Instead, they are relying on an office manager, KO, who fraudulently prepared government-required forms, for a fee, by falsely portraying herself as a nurse, or in some instances, a medical doctor, and indicating false compliance with medical examination requirements necessary for immigration applicants to register permanent residence or adjust their immigration status.

## V.   OVERVIEW OF USCIS FORM I-693, REPORT OF IMMIGRATION MEDICAL EXAMINATION AND VACCINATION RECORD

7.   When immigrating to the United States, applicants are often required to undergo a medical examination to ensure that they do not pose a health risk to the public.  USCIS Form I-693 ("I-693"), officially known as the "Report of Medical Examination and Vaccination Record," is the document used to record the results of this examination.  When applying for a green card, an applicant must submit a completed I-693 form with

3

the USCIS Form I-485, Application to Register Permanent Residence or Adjust Status.

8.    The primary purpose of the I-693 is to assess the health status of immigrants applying for adjustment of status to permanent resident.  It is important to the United States government because it helps enforce the public health requirements of immigration law.  Under the Immigration and Nationality Act (INA §212(a)(1)), certain health conditions can make someone inadmissible to the United States.  The medical examination as part of the I-693 is intended to identify any communicable diseases of public health significance and ensure that immigrants have received the required vaccinations to prevent the spread of infectious diseases in the United States. Only designated civil surgeons (approved physicians by USCIS) can complete and sign the form.  This ensures standardized screening nationwide.

9.    When filing the I-693 form, the designated civil surgeon conducting the medical examination is primarily assessing the applicant for medical conditions that may pose a risk to public health or safety.  The I-693 form verifies whether an applicant has:

- Communicable diseases of public health significance (e.g., active tuberculosis);
- Required vaccinations;
- Physical or mental disorders associated with harmful behavior; and
- Drug abuse or addiction (as defined under immigration law).

4

## VI. VIOLATION OF 18 U.S.C. §1546

10.  Based on my training and experience and review of Title 18, United States Code, Section 1546(a), I understand that the statute prohibits in part:

Whoever knowingly makes under oath, or as permitted under penalty of perjury under section 1746 of title 28, United States Code, knowingly subscribes as true, any false statement with respect to a material fact in any application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, or knowingly presents any such application, affidavit, or other document which contains any such false statement or which fails to contain any reasonable basis in law or fact.

(emphasis added).

11.  When applying for a green card, I understand that an applicant must submit a completed I-693 form with the USCIS Form I-485, Application to Register Permanent Residence or Adjust Status.

## VII. STATEMENT OF PROBABLE CAUSE

### A. The Investigation

12.  In August 2025, HSI and IRS-CI, initiated its investigation in coordination with USCIS into a conspiracy to defraud the United States of immigration benefits.  USCIS has been conducting an administrative investigation of KO and H.K. since February 2025.  Based on information obtained from USCIS and other sources, there is probable cause to believe that KO and H.K. were engaged in a conspiracy to defraud the United

5

States of immigration benefits, and, in furtherance of that conspiracy has committed related crimes as described below.

**B. General Summary of the Conspiracy**

13.  Based on my discussions with USCIS personnel, who became aware of the present scheme through a previous criminal investigation involving marriage fraud, I understand that from at least January 1, 2019, to sometime in July 2025, office worker KO partnered with civil surgeon and licensed physician, H.K, to misrepresent medical examinations required for green card approval.  Instead of H.K. conducting the immigration medical examinations and completing the I-693 forms, KO, representing herself as a nurse, and in some instances, a medical doctor, performed the medical examinations and completed the I-693 forms in the absence and in lieu of H.K.  USCIS documents show that H.K. is male, who is a designated civil surgeon, and born on October 9, 1938.  H.K. received his medical degree in 1963 from Catholic Medical College.

14.  Based on my review of USCIS applicant interviews and discussions with USCIS, I understand that KO charged $180.00 to $1,000.00 for a medical exam, often requesting payments made in cash.  Witness statements also indicated that KO conducted the medical examinations herself and signed off as H.K., swearing under penalty of perjury.  From discussions with USCIS personnel, I learned that of 98 sworn statements from individuals who received their I-693 forms certified at H.K.'s office, only seven individuals attested to seeing a male civil surgeon.  I also learned that 92 individuals stated that they

6

were never examined by a male doctor or staff member.  Instead, they were only examined by an Asian female.  Approximately 19 of those individuals conclusively identified a photograph of KO as the female who conducted the examinations.

15.  In or around July 2025, H.K. closed his medical practice and retired.  Subsequently, through open-source searches, I learned that KO started performing immigration medical exams and completed the I-693 forms at H.L.'s medical practice.  According to USCIS, H.L. was initially designated a civil surgeon by USCIS on September 9, 2019.  USCIS documents show that H.L. is male, and born on June 9, 1976.  H.L. received his medical degree in 2006 from American University of the Caribbean.

16.  From review of a USCIS Form I-910, Application for Civil Surgeon Designation, signed by H.K. and dated April 11, 2018, and discussions with USCIS, I learned that KO was employed by and worked at the medical office of H.K since 1997 up until at least July 2025.  According to USCIS, H.K. was initially designated a civil surgeon by USCIS on April 21, 2006.  Based on my discussions with USCIS, KO was the sole employee of H.K. based on the I-910 form.  H.K. operated a medical practice under the corporation name, "H.K.", M.D., INC., in Los Angeles, California until approximately July 2025.  H.K.'s designated status was revoked by USCIS in October 2025[1].

---

[1] According to USCIS, H.K's civil surgeon designation was revoked due to derogatory information related to the USCIS investigation of KO and H.K.

17.  In addition, based on discussions with USCIS, I learned that H.K. and KO were connected to a large-scale marriage fraud ring that operated from at least October 2016 through March 2022 and submitted fraudulent green card applications for over 600 non-citizens.  The USCIS investigation uncovered that many of the I-693 forms of the clients of the sham marriage fraud "agency" were certified by H.K.'s office.  Of the 600 applications, approximately 362 were identified within the western region.  Half of those applications involved I-693 forms that were certified by H.K.  During the course of that investigation, it was discovered that clients were regularly referred to a woman at H.K.'s office named, "Angie."[2]

**C. KO's Person and Subject Background**

18.  I have reviewed a picture of KO based on her California Department of Motor Vehicles photo which is included in Attachment A-1.  KO is described as 5'3" tall with brown hair and black eyes according to her California DMV records.

19.  According to law enforcement and public records checks and initial communication with the California Board of Registered Nursing, KO is not licensed in the State of California or in any other state as a registered nurse, nurse practitioner, or a medical doctor.  KO documented in her green

---

[2] Reviews on Yelp, an online review platform, by individuals who had their Form I-693 forms prepared at H.K.'s office mention that the immigration exam and forms were completed by "Angie." Reviews also mention that Angie was a nurse.  KO was identified as "Angie" from USCIS field interviews of individuals who had their Form I-693 forms certified at H.K.'s office.  Further, KO identified herself as "Angie" during a communication with an HSI undercover agent On October 31, 2025.

card application that she was a registered nurse in South Korea in the early 1990s.

### D. Interview of Witness, "E.D."

20.   Based on an interview with USCIS applicant, E.D. ("WITNESS-1"), WITNESS-1 went to H.K.'s office in February 2025 for an immigration medical exam.  KO collected WITNESS-1's ID card and vaccination record.  After filling out an intake form with WITNESS-1's personal information, KO took WITNESS-1 to an exam room for a blood draw.  WITNESS-1 also provided a urine sample.  KO did not ask WITNESS-1 questions related to drug usage and mental health, topics that are supposed to be filled out on the I-693 form.  WITNESS-1 paid approximately $250.00 in cash and was told to return to the office in three days.  The visit lasted approximately 10-15 minutes.

21.   Three days after the initial visit, WITNESS-1 returned to H.K.'s office, located at 3663 West 6th Street, Suite 203, Los Angeles, CA.  KO showed WITNESS-1 results of the test on the I-693 form.  WITNESS-1 observed KO sign the civil surgeon signature blocks on the I-693 form.  WITNESS-1 was able to identify KO through pictures that I provided to WITNESS-1, including KO's California DMV photograph.  WITNESS-1 also observed KO place the I-693 form into an envelope and seal it before providing it to WITNESS-1.

22.   I compared the signatures on WITNESS-1's I-693 form to H.K.'s signatures on H.K.'s bank documents and believe they are replicas of H.K.'s signature.  The signature does not appear to

9

be KO's signature based on a review of her signature with the California DMV.

Civil Surgeon Signature Blocks on WITNESS-1's I-693 Form:

Page 3:



**Preparer's Certification and Signature**

I certify, under penalty of perjury, that I prepared this application for the applicant at their request and with express consent and that all of the responses and information contained in and submitted with the application are complete, true, and correct and reflects only information provided by the applicant. The applicant reviewed the responses and information and informed me that they understand the responses and information in or submitted with the application.

6. Preparer's Signature          Date of Signature (mm/dd/yyyy)
                                  02/20/2025

Parts 5. - 10. of this form must be completed by the civil surgeon.

Page 5:

**Civil Surgeon's Signature**

8. Civil Surgeon's Signature          Date of Signature (mm/dd/yyyy)
                                      02/20/2025

H.K.'s true signatures on H.K.'s bank records:

☐ Authorized Signer (See Owner/Signer Information for Authorized Signer designation(s).)
[ x          ]

☐ Authorized Signer (See Owner/Signer Information for Authorized Signer designation(s).)
[ x          ]

23.   WITNESS-1 did not see any other employees or patients during both visits.

24.   WITNESS-1 believed KO was H.K.

**E. The SUBJECT TELPHONE NUMBER and Connection to the Scheme**

*a.    Undercover Meeting with KO*

25.   On July 16, 2025, a Yelp user posted on H.K.'s Yelp page that H.K.'s office was closed and to call H.L.'s office to schedule a green card medical examination with KO.  On July 31, 2025, Yelp user, "young joo k.," possibly KO, posted on H.K.'s Yelp page to call the SUBJECT TELEPHONE NUMBER for immigration medical exams.

26.   Law enforcement records checks, and a review of Verizon records show that the SUBJECT TELEPHONE NUMBER is subscribed to KO at the address of the KO.

27.   On October 31, 2025, an HSI undercover agent ("UCA") called the SUBJECT TELEPHONE NUMBER and left a voice message. KO replied by text message identifying herself as "Angie" and that she would call at a later time.  KO later called the UCA and asked if the UCA needed "immigration testing" requesting vaccination and insurance details.  After stating that the fee for the exam was $180.00, KO scheduled an appointment for November 12, 2025, and provided a picture of H.L.'s business card with the address of H.L.'s clinic.  H.L.'s clinic's name was Vitacare Medical Associates ("VITACARE"), located at 966 South Western Avenue, Suite 201, Los Angeles, CA.  KO also sent additional text messages about necessary immunizations, told the UCA to bring the UCA's identification card, vaccination records, confirmed the price, and explained H.K.'s retirement.

28.   On November 21, 2025, the UCA went to H.L.'s office in Los Angeles for the pre-scheduled immigration medical

examination with KO.  Upon approaching the front door of the office, the UCA encountered KO wearing a burgundy-colored medical uniform at the front door.  KO was escorting two female patients out of the office at this time.  The UCA checked in at the front desk with one of H.L.'s employees.  H.L.'s medical assistant was also behind the receptionist's desk.  The UCA provided the UCA's ID and vaccination record to the medical assistant who then handed the UCA VITACARE intake forms to complete.  While filling out the forms, KO greeted the UCA behind the front desk.  The medical assistant asked the UCA for the UCA's polio vaccination records and told the UCA to e-mail it later to hello@vitacaremed.com.  The medical assistant then handed the UCA a cup for a urine sample and directed the UCA to the restroom.  Upon exiting the restroom, KO greeted the UCA in the hallway, took the urine sample, and directed the UCA to the medical examination room where the medical assistant was preparing to take blood work.  KO also followed the UCA into the room.  The medical assistant informed the UCA that they cannot start the exam without taking blood and obtaining the lab results first.  The UCA told the medical assistant and KO that the UCA was not going to give blood at that moment and would text KO to reschedule.  During the visit, the UCA did not observe H.L. inside the clinic.

       b.    ***Zelle Payments Received for Immigration***

*Exams*

29.   KO's Zelle[3] account is associated with the SUBJECT TELEPHONE NUMBER.  A review of payments received between April 1, 2023, and October 29, 2025, includes payments for providing services related to immigration medical exams.  The description of the payments by the senders includes, "green card," "medical," "medical exam," "medical for immigration," "immigration medical exam" indicates services were provided for immigration medical exams.  Further, the payment amount of $180.00 for the medical exams coincide with information obtained from internet reviews and witness statements.

30.   Based on my training and experience, I know that individuals involved in illegal activities such as the SUBJECT OFFENSES commonly use digital devices, including cellular telephones, to further their illegal schemes and communicate with associates.

31.    Because of the ability to store data on removable digital media, as well as cloud-based Internet storage, information such as text communications can readily be transferred between different digital devices, such as between smartphones.

32.   Cellular telephones are presently one of the most commonly used forms of communication.  People regularly carry a cellular telephone on their person at all times in order to communicate with others, navigate, or perform internet searches,

---

[3] Zelle is a U.S. based digital payments network that allows users to send and receive money directly between bank accounts using a mobile device or a bank's website or app.

13

among other uses.  For these reasons and based on the facts detailed elsewhere in this affidavit, I believe KO likely carries her cellular telephone on her person and that her cellular telephone likely contains evidence pertaining to the government's investigation of illegal activities such as the SUBJECT OFFENSES.

33.  Subscriber records from Verizon for the SUBJECT TELEPHONE NUMBER list the subscribers as "Anselmo Ko"[4] and "Young Joo Ko" with the listed address as 526 N. Serrano Ave., Los Angeles, CA 90004.  This is the same address listed as the residence for KO in her California DMV records.  Therefore, I believe that the SUBJECT DEVICE will be found within the Central District of California.

34.  According to records obtained from Verizon, the SUBJECT TELEPHONE NUMBER was at one time associated with an Apple iPhone 13 and International Mobile Equipment Identifier 350183988147401.

35.  Based on the information set forth above, I believe that evidence, fruits, and instrumentalities of crime, as detailed herein and in Attachment B will be found on the SUBJECT PERSON and the SUBJECT DEVICE.

**F. Tax Fraud and Money Laundering Conspiracy**

36.  KO deposited significant amounts of cash that may not have been reported on her tax returns.  KO submitted a 2023 Federal Income Tax Return to USCIS reporting total wages of

---

[4] Public records and law enforcement database checks of Anselmo Ko show that he was a relative of KO and was deceased on June 13, 2021.

$47,006, supported by a W-2, Wage and Tax Statement, filed by H.K.  Bank analysis of KO's bank accounts show significant cash deposits totaling $183,765.00 from 2020 to 2025.  In 2023, KO deposited $38,405.00 in cash into her bank accounts in addition to depositing checks totaling $42,298.74 paid by H.K.

37.  Based on bank records, witness interviews, and document analysis, there is probable cause to believe that funds deposited into H.K.'s operating account (Account 4410688) at Hanmi Bank constitute proceeds of unlawful activity, specifically fraud involving immigration medical examinations. Records indicate that H.K. deposited proceeds from the unlawful scheme into a business operating account that also received payments from legitimate sources.  Based on my training and experience, individuals engaged in financial crimes commonly comingle illicit proceeds with legitimate funds in order to obscure the origin of the criminal proceeds.  Based on my training and experience, individuals involved in financial crimes commonly maintain records of financial transactions, bank account information, tax records, ledgers, electronic spreadsheets, and communications relating to their illegal activity at their residences, offices, and on electronic devices.  Bank records reflect multiple cash deposits made on the same day or consecutive days in amounts below $10,000. Based on my training and experience, such activity is consistent with attempts to avoid federal currency reporting requirements and conceal the nature and source of illicit proceeds, conduct

commonly referred to as structuring in violation of 31 U.S.C. §5324.

### VIII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

38. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable

16

data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

39.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which

17

may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

40.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when

18

a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress [TARGET]'s thumb and/or fingers on the device(s); and (2) hold the device(s) in front of [TARGET]'s face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

## IX. CONCLUSION

41.  For all the reasons described above, there is probable cause to believe that KO committed Fraud and Misuse of Visas, Permits, and Other Documents, in violation of 18 U.S.C. § 1546(a).

///

///

19

42.    Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found on the SUBJECT DEVICE, and on the person of KO, as described in Attachments A-1 through A-2.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 31st day of March, 2026.

_Alicia G. Rosenberg_

_____
HONORABLE ALICIA G. ROSENBERG
UNITED STATES MAGISTRATE JUDGE